UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**TREY CIULLA-HALL**
         **Plaintiff,**

vs.                                                        **CASE NO.**

**NATIONAL
COLLEGIATE
ATHLETIC
ASSOCIATION (NCAA),**

         **Defendant.**

---

## COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF

---

Plaintiff Trey Ciulla-Hall ("Trey") brings this action to contest a decision based on Bylaws
14.4.3.7.1.3 – ("Extenuating Circumstances") and 14.4.3.7 – ("Season-of-Competition Waiver –
Competition While Eligible") of the Defendant, the National Collegiate Athletic Association
("NCAA"). These bylaws pertain to the number of years college baseball players can participate in
Division II NCAA baseball and at NCAA Division I schools. This action aims for declaratory and
injunctive relief against the defendant, along with other remedies.

### PARTIES

1.  Plaintiff Trey Cuilla-Hall has been accepted into a master's degree program at the
    University of Maryland ("Maryland") and currently resides in New Bedford,

Massachusetts. His deadline to enroll in classes is February 7, 2025, for the Spring 2025 semester.

2.  In 2020, Trey attended Stonehill College ("Stonehill") in North Easton, Massachusetts. He was a non-scholarship baseball player during his freshman year, which began in the fall of 2020. He remained at Stonehill for four more years, graduating in May 2024. He has been accepted to the University of Maryland to pursue a master's degree and play college baseball. His initial enrollment at Stonehill was for the 2020-2021 academic year, as the fall baseball season was canceled due to COVID-19 restrictions.

3.  The NCAA, a defendant in this case, is an unincorporated association that governs college sports. It includes over 1,100 member colleges and universities across the United States, including those in Bristol County, Massachusetts. These member institutions are categorized into three divisions, with Division I consisting of more than 350 schools.

4.  The NCAA and its members have established regulations through the NCAA Constitution and Bylaws that govern all aspects of college sports. Specifically, the Bylaws relevant to this case include Bylaw 12.8.1 (Five-Year Rule); 12.8.1.7 ("Waiver"); 12.8.1.7.1.1 Circumstances Beyond Control; 14.4.3.7.1.3 ("Extenuating Circumstances"); and 14.4.3.7 ("Season-of-Competition Waiver – Competition While Eligible").

5.  The NCAA Constitution and Bylaws were adopted by the member institutions and various NCAA councils, and they can be amended by the member institutions or NCAA councils. Therefore, the rules established in the NCAA Constitution and Bylaws represent horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

6.  Bylaw **12.8.1 Five-Year Rule** states A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate

institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.

7.  **Bylaw 14.4.3.7 of Division II states**: Competition While Eligible. A student-athlete may be granted an additional season of competition by the Committee on Student-Athlete Reinstatement when, due to extenuating circumstances (per Bylaw 14.24.3.7.1.3), the student-athlete, while eligible, did not compete in more than three contests or dates of competition (whichever is applicable to that sport) or 30 percent (whichever number is greater) of the maximum permissible number of contests or dates of competition set forth in Bylaw 17. The competition must occur prior to the first competition of the second half of the playing season that concludes with the NCAA championship in that sport. All competition (including a scrimmage) against outside participants shall be countable under this limitation in calculating the number of contests or dates of competition in which the student-athlete participated.

8.   **Bylaw 14.4.3.7.1.3 of NCAA Division II states  Extenuating Circumstances**.

Extenuating circumstances include, but are not limited to, the following: (Adopted: 1/13/03 effective 8/1/03)

> (a) The student-athlete is unable to compete as a result of a life-threatening injury or illness suffered by a member of the student-athletes immediate family, which clearly is supported by contemporaneous medical documentation; (Revised: 1/10/05 for any competition occurring on or after 8/1/03)

> (b) The student-athlete is unable to compete as a result of extreme financial difficulties as a result of a specific event (e.g., layoff, death in family) experienced by the student-athlete or an individual on whom the student- athlete is legally dependent.

These circumstances must be clearly supported by objective documentation (e.g.,

decree of bankruptcy, proof of termination) and must be beyond the control of the

student-athlete or the individual on whom the student-athlete is legally dependent;

(Revised: 1/10/05 for any competition occurring on or after 8/1/03)

(c) The student-athlete's institution dropped the sport (in which the student has

practiced or competed) from its intercollegiate program; and

(d) The student-athlete participated in nonregular-season competition (e.g., alumni

contest, exhibition contests, scrimmages, nonchampionship segment contests) due to

a coach's documented misunderstanding of the legislation. The competition must have

occurred while the student-athlete was representing an NCAA institution. (Adopted:

1/14/08, Revised: 7/22/08 effective 8/1/08, 10/21/08) [1]

---

1.  [1] **Bylaw 12.8.1.7. of Division I** states in the relevant part: A waiver of the five-year period of eligibility is designed to allow a student-athlete to participate in four seasons of intercollegiate competition within a five-year period. This waiver may be granted, based upon objective evidence under the following circumstances: ….

(a)  The student-athlete did not use a season of intercollegiate competition due to an institutional decision to redshirt the student-athlete; the student-athlete was listed on the institution's squad list and was eligible for competition during the segment of the season that concludes with the NCAA championship; and the student-athlete was deprived of the opportunity to participate in intercollegiate competition in one other season due to circumstances beyond the control of the student-athlete or institution. (The use of this provision is limited to one time in a student-athlete's period of eligibility); or

(b)  The student-athlete is deprived of the opportunity to participate for more than one season in his or her sport within the five-year period of eligibility for reasons that are beyond the control of the student-athlete or the institution.

2.  **Bylaw12.8.1.7.1.1 of Division I** states Circumstances Beyond Control. Circumstances considered to be beyond the control of the student-athlete or the institution and do not cause a participation opportunity to be used shall include, but are not limited to, the following:

(a)  Situations clearly supported by contemporaneous medical documentation, which states that a student-athlete is unable to participate in intercollegiate competition as a result of incapacitating physical or mental circumstances;

(b)  The student-athlete is unable to participate in intercollegiate athletics as a result of a life-threatening or incapacitating injury or illness suffered by a member of the student-athlete's immediate family, which clearly is supported by contemporaneous medical documentation;

(c)  Reliance by the student-athlete upon written, contemporaneous, clearly erroneous academic advice provided to the student-athlete from a specific academic authority from a collegiate institution regarding the academic status of the student-athlete or prospective student-athlete, which directly leads to that individual not being eligible to participate and, but for the clearly erroneous advice, the student-athlete would have established eligibility for intercollegiate competition;

(d)  Natural disasters (e.g., earthquake, flood); and

(e)  Extreme financial difficulties as a result of a specific event (e.g., layoff, death in

(f)  the family) experienced by the student-athlete or by an individual upon whom the student-athlete is legally dependent, which prohibit the student-athlete from participating in intercollegiate athletics. These circumstances must be clearly supported by objective

(g)  documentation (e.g., decree of bankruptcy, proof of termination) and must be beyond the control of the student-athlete or the individual upon whom the student-athlete is legally dependent.

9. In practical terms, an academic institution that aims to actively participate in the highest level of collegiate athletics must maintain membership in the NCAA and comply with the Division I rules and regulations established by the NCAA and its members. Not following these rules and regulations may subject the institution's sports programs to punitive measures from the NCAA.

10. The NCAA and its member institutions control the highest level of collegiate athletics. Therefore, any individual who wishes to derive substantial benefits from competing at the highest level of collegiate athletics must, by necessity, attend an NCAA Division I member institution.

11. There are no viable alternatives that can match the unique combination of attributes provided by Division I NCAA athletic schools, including: (i) high-quality academic services, (ii) outstanding training facilities, (iii) top-tier coaches, (iv) exposure to scouts, agents, and team representatives that offer athletes the best chance to pursue professional careers, (v) national exposure through championships and broadcasting contracts, and perhaps most importantly, (vi) recent opportunities to benefit from NIL agreements and substantial revenue sharing, and (vii) competition at the highest level of collegiate athletics.

12. If he is not granted at least another year of eligibility, the plaintiff must declare by or before February 7, 2025, whether he intends to attend Maryland post-bachelor degree and play college baseball for the 2025 season.

13. The plaintiff would opt to play Division I baseball for several reasons, including the chance to continue benefiting from NIL, substantial revenue sharing, and other unique opportunities available in Division I athletics.

14. On December 13, 2024, Maryland submitted its waiver appeal to the NCAA.[2]

---

[2] Exhibit 1 is a record of the entire filing to the NCAA from Maryland. (64 pages)

15. Maryland offered the plaintiff a chance to return to Division I baseball, but the NCAA's decision dated January 28, 2025, denied him that opportunity. [3]

16. The NCAA's decision denying the waiver causes him significant harm and constitutes a violation of its Bylaws 14.4.3.7.1.3 – ("Extenuating Circumstances") and 14.4.3.7 – ("Season-of-Competition Waiver – Competition While Eligible").

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over the federal claim asserted under 28 U.S.C. §1331 and ancillary jurisdiction over the remaining state claims.

18. This Court may exercise specific personal jurisdiction over Defendant NCAA in the Commonwealth of Massachusetts due to its connections with the Commonwealth and its intentional activities through guidelines and bylaws for college baseball directed at both Maryland and Massachusetts. The Defendant and its member institutions engage in athletic competitions, ticket and merchandise sales, television agreements, and other substantial revenue-generating activities in the Commonwealth of Massachusetts.

19. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2).

## BACKGROUND FACTS

20. The plaintiff initially enrolled at Stonehill, a Division II school, in the fall of 2020.

21. The plaintiff took part in one (1) contest beyond the normally scheduled legislated limits due to considerable confusion regarding the COVID season of competition relief at the Division II and III levels. The institution and coaching staff made every effort to provide a season of competition, which involved scheduling eleven (11) contests between two (2) institutions, representing approximately thirty-four percent (~34%) of the total contests in the Spring of

---

[3] Exhibit 2

2021.

22. Due to strict COVID-19 restrictions, Stonehill's fall baseball season for 2020-2021 was canceled, including all team practices during the fall semester of 2020.

23. In the fall semester of Trey's freshman year, he had no experience with "fall ball" due to COVID-19. During that period, because of restrictions from the college, league, and NCAA, the team did not have any practices or games and only conducted individual workouts.

24. During this time, the institution prohibited baseball activities due to the impacts of COVID. When they resumed in February 2021, they were conducted only in small groups.

25. The spring semester of 2021 saw limited practice and game opportunities.[4]

26. On February 4, 2021, the team was informed that the institution would transition to remote operations for ten days due to positive COVID tests, which would impede preparation for the season.

27. Several contests were limited, canceled, and/or rescheduled on short notice.

28. The Spring 2021 baseball season was restricted due to the NCAA and NE-10's COVID-19 guidelines. Stonehill limited its schedule to thirty-six (36) games against only nine (9) different schools. Six (6) of those games were canceled because of COVID-19. Twenty (20) of the games were scheduled to be played against only two (2) schools.

29. On March 19, 2021, contests against Saint Anselm College and Wentworth Institute of Technology was scheduled for March 20, 2021, and March 21, 2021, respectively, leaving less than two days to prepare. [5] Stonehill usually plays 48-50 games per normal season.

30. The plaintiff went on to compete in twenty-one (21) out of thirty-two (32) contests.[6]

---

[4] See Exhibit 3
[5] See Exhibit 4
[6] See Exhibit 5

31. In the thirty-two (32) games that Stonehill played, Trey participated in only twenty-one (21) of them. During those twenty-one (21) games, Trey had sixty-four (64) plate appearances.

32. In addition to the disruptions to the playing season, the Plaintiff was handling extra responsibilities due to his mother's life-threatening illness. His mother was hospitalized at least once (on March 24, 2021), and the Plaintiff traveled home to care for his siblings and provide support. [7]

33. The illness also created financial challenges for the plaintiff's family. The plaintiff did not receive an athletic scholarship, and his mother was unable to work.

34. The Plaintiff sought the assistance of a therapist during the fall of 2020 and the spring of 2021 to manage the above stressors in his life.[8]

35. The Plaintiff seeks relief by requesting an order directing the NCAA to allow him to participate in a fourth significant season due to the unique circumstances surrounding the 2020-21 academic year.

36. The Plaintiff has been an outstanding student-athlete, graduating in four years. He should be allowed to experience his time as a student-athlete fully.

37. Considering the overall context: (1) the Plaintiff's mother faced a life-threatening illness that required hospitalization; (2) the Plaintiff needed additional support from their family; (3) the Plaintiff's family encountered financial difficulties due to the mother's incapacitation from her illness; (4) the 2020-21 playing and practice season was significantly disrupted by the effects of COVID; (5) there was uncertainty regarding COVID-related season competition relief at the Division II level; (6) the maximum number of contests during the 2020-21 academic year was decreased from the standard forty-eight

---

[7] See Exhibit 6
[8] See Exhibit 7

(48) to fifty (50); (7) the Plaintiff participated in one (1) contest during the normal

scheduled season, exceeding the intent of the COVID-19 relief for spring sports in 2021 at

the Division II level; (8) the Plaintiff did not experience a meaningful season of

competition during the 2020-21 academic year.

38. In the landmark 2021 decision, *NCAA v. Alston*, 594 U.S. 69 (2021), a unanimous

U.S. Supreme Court gutted the prior restraint on what a college athlete could receive while

eligible and playing collegiate athletics.

39. While courts had previously deferred to anticompetitive NCAA rules to protect

"amateurism" in the NCAA, it is acknowledged that "when market realities change, so may

the legal analysis," and that "the market realities [of college sports] have changed

significantly since 1984." *Id*., 594 U.S. at 98.

40. Reacting to the Supreme Court's ruling in *Alston*, the NCAA lifted its prohibition on NCAA

athletes receiving NIL Compensation on July 1, 2021. In reality, such opportunities are only

meaningfully available to Division I athletes.

41. The plaintiff graduated from Stonehill with a bachelor's degree in Psychology.

42. On November 12, 2024, Maryland submitted a request for a waiver to the NCAA,

seeking a ruling that the plaintiff be allowed to play another season of college

baseball at Maryland.

43. The NCAA issued a formal Decision denying the waiver today, January 28, 2025.

44. The plaintiff seeks relief from this court to prevent the NCAA from enforcing its Five-Year

Rule and Bylaws 14.4.3.7.1.3 – ("Extenuating Circumstances") and 14.4.3.7 – ("Season-

of-Competition Waiver – Competition While Eligible") as they pertain to the facts of this

case. Enforcement would violate Section 1 of the Sherman Act by hindering the plaintiff's

ability to compete in the third and fourth years of NCAA Division I baseball in the Spring

of 2025, due to his prior attendance at Stonehill, the COVID-19 restrictions during his freshman year, and his mother's serious illness.

### COUNT I:
### *PER SE* VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

45. Plaintiff incorporates by reference every allegation contained in this Complaint.

46. The defendant holds a dominant position in the relevant market and, in fact, shapes the market.

47. The defendant's contracts, combinations, and relationships entail an ongoing agreement, understanding, and coordinated efforts among the defendant, its members, vendors, and customers. The significant terms are intended to artificially fix, reduce, maintain, and/or restrict the quantity of college athletic services across the United States and its territories and possessions.

48. Simultaneously, the defendant's contracts, combinations, and relationships indicate a continuous agreement, understanding, and coordinated action among the defendant, its members, vendors, and customers. The main terms of this arrangement aim to artificially fix, raise, maintain, and/or inflate prices for the performance and/or broadcasting of college sports events in the United States and its territories and possessions.

49. Furthermore, the defendant's contracts, combinations, and relationships entail a continuing agreement, understanding, and coordinated action among the defendant and its members, vendors, and customers. The primary terms seek to artificially fix, suppress, maintain, and stabilize the prices for collegiate athletic services in the United States, its territories, and possessions.

50. The defendant's actions have excessively restricted competition, violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

51. These actions include, but are not limited to, preventing college student-athletes like the

plaintiff from struggling to balance their schoolwork, athletics, and family during

challenging times caused by circumstances beyond their control, which affects their ability

to compete in NCAA Division I baseball.

52. The Plaintiff should be commended for his efforts to balance academic life, athletic

responsibilities, and family care during this challenging time for everyone involved. He

should not face limitations in his economic opportunities to engage in the NIL marketplace

open to Division I athletes, nor should competition be unreasonably restricted in violation

of Section 1 of the Sherman Act, 15 U.S.C. § 1.

53. These actions include, but are not limited to, applying the defendant's rules and

regulations in an arbitrary and capricious manner to deny the plaintiff a hardship waiver.

54. These actions involve disregarding the defendant's guidelines for waivers related to fifth-

year eligibility of NCAA member institutions for college student-athletes and denying

eligibility waivers even when circumstances justify granting such waivers.

55. The defendant's actions affect interstate commerce.

56. Defendant's actions have produced and, unless restrained, will continue to produce the

following anti-competitive impact, among others:

    a.   Restrict and diminish the number of athletes participating in college athletics.

    b.   Deprive athletes like the plaintiff of the advantages of competition regarding the

        amount, terms, and conditions of grants-in-aid from NCAA member institutions;

    c.   Restrict and diminish athletes' ability to profit from their name, image, and

        likeness at the highest level; and

    d.   Restrict competition in name, image, and likeness services for athletes

        and ensure substantial revenue sharing.

57. As a direct and proximate result of the defendant's actions, the plaintiff has been, is now,

and will continue to be irreparably harmed and financially damaged.

58. The NCAA's restriction on the economic rights of the plaintiff and other athletes in similar circumstances constitutes a clear, *per se* restraint of trade.

59. The plaintiff is entitled to recover from the NCAA three times the actual damages, along with reasonable attorneys' fees and costs of the lawsuit.

60. The plaintiff is entitled to a declaratory judgment that declares void and unenforceable all NCAA rules, regulations, bylaws, or decisions preventing him from playing baseball for Maryland for an additional year under the current system with the waiver if the Sherman Act applies.

61. The plaintiff is entitled to a permanent injunction enjoining the defendant from continuing the violations described in this Complaint.

## COUNT II:
## UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

62. Plaintiff incorporates by reference every allegation contained in this Complaint.

63. As an alternative to Plaintiff's Count I, if the Court determines that the defendant's conduct does not constitute a per se antitrust violation, either in whole or in part, the plaintiff alternatively pleads that the defendant's conduct, when analyzed through the "quick look" or full "rule of reason" antitrust analysis, violates the Sherman Act.

64. The anti-competitive nature of the defendant's actions is so obvious that a thorough examination of the surrounding marketplace is unnecessary. According to this analysis, as the Supreme Court has stated, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anti-competitive effect on customers and markets." *See, California Dental Association v. FTC*, 526 U.S. 756 (1999).

65. Applying these terms to the current case indicates that the defendant has violated the Sherman Act.

66. Alternatively, applying a full antitrust analysis of the present case shows that the defendant has violated the Sherman Act.

67. At all relevant times and continuing through the resolution of this case, the NCAA has engaged in and continues to engage in contracts, combinations, and conspiracies that prevent college student-athletes like the plaintiff, who experienced difficult circumstances beyond their control, and otherwise unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

68. The defendant's actions have a direct impact on interstate commerce.

69. The actions organized by the NCAA, which holds a dominant position in the relevant market, have generated and will continue to generate, unless restricted, various anti-competitive effects, among others:

   a. Artificially restrain and depress the number of athletes that participate in college

      i. athletics;

   b. Deprive athletes like the plaintiff of the benefits of competition regarding the amount, terms, and conditions of grants-in-aid from NCAA member institutions;

   c. Unjustly restrict and diminish athletes' ability to benefit and profit from their name, image, and likeness at the highest level, along with substantial revenue sharing; and

   d. Artificially restrain competition in name, image, and likeness services among athletes.

70. The NCAA's limitation on the plaintiff's economic rights constitutes a restraint of trade and is unrelated to any legitimate non-commercial goals.

71. The anti-competitive effects of the defendant's scheme substantially outweigh any alleged

pro-competitive effects or justifications that the defendant may offer.

72. Reasonable and less restrictive alternatives to the defendant's current anti-competitive practices exist. These include but are not limited to, allowing all student-athletes equal playing time at a Division I institution. This approach avoids unreasonable restrictions on their access to various career opportunities, NIL benefits, and other advantages available to Division I participants.

73. A rational, consistent, and unbiased application of its own rules, regulations, policies, and procedures would offer a more reasonable and less restrictive alternative to the defendant's current anti-competitive practices.

74. The plaintiff is entitled to recover from the NCAA three times the actual damages, along with reasonable attorneys' fees and costs of the lawsuit.

75. The plaintiff is entitled to a declaratory judgment that declares void and unenforceable any and all NCAA rules, regulations, bylaws, or decisions that prevent him from playing baseball at Maryland for at least another year.

76. The plaintiff is entitled to a permanent injunction that would prevent the defendant from continuing the violations described in this complaint.


**COUNT III:**
**TORTIOUS INTERFERENCE WITH THE CONTRACT WITH THE SCHOOL**

77. The Plaintiff incorporates by reference all allegations stated in this Complaint.

78. The plaintiff has a contractual relationship with Maryland.

79. As an integral part of that relationship, the plaintiff is entitled to, and indeed expected to, participate on the varsity baseball team.

80. The NCAA knew about this relationship.

81. The NCAA has disrupted the relationship between the plaintiff and Maryland, as well as

the plaintiff's expectations with Maryland.

82. The NCAA's interference includes, but is not limited to, denying the plaintiff a waiver to which he is entitled; acting arbitrarily or capriciously regarding his eligibility; disregarding his rights; and violating the NCAA's own rules and guidelines.

83. The NCAA had a responsibility not to tortiously or unnecessarily interfere with the plaintiff's relationships, and it specifically had a duty to adhere to its own rules, regulations, bylaws, and guidelines, and to avoid acting in an arbitrary or capricious manner regarding him.

84. The NCAA's interference with the relationship between Maryland and the plaintiff has harmed and will continue to harm the plaintiff.

85. The plaintiff is entitled to damages for the NCAA's interference.

## COUNT IV:
## TORTIOUS INTERFERENCE – OTHER PARTIES

86. Plaintiff incorporates by reference every allegation contained in this Complaint.

87. The plaintiff has contracts with third parties for the use of his name, image, and likeness.

88. As part of those relationships, the plaintiff is expected to be a prominent athlete in the community and the nation.

89. The more prominent the plaintiff is as a student-athlete, the more valuable those relationships grow.

90. The NCAA was aware of or should have been aware of these relationships.

91. The NCAA has disrupted the relationships between the plaintiff, the plaintiff's expectations, and those of third parties.

92. The NCAA's interference includes, but is not limited to, denying the plaintiff a waiver to which he is entitled, acting arbitrarily or capriciously regarding the plaintiff and his eligibility, neglecting the plaintiff's rights, and violating the NCAA's own rules and

guidelines.

93. The NCAA was responsible for preventing tortious and unwarranted interference in the plaintiff's relationships. Furthermore, it was required to follow its own rules, regulations, bylaws, and guidelines and avoid acting arbitrarily or capriciously toward the plaintiff.

94. The NCAA's interference in the relationship between third parties and the plaintiff has caused harm and will continue to do so.

95. The plaintiff is entitled to damages for the NCAA's interference.

## COUNT V:
## BREACH OF CONTRACT –THIRD-PARTY BENEFICIARY

96. The Plaintiff incorporates by reference all allegations stated in this Complaint.

97. "The National Collegiate Athletic Association is a member-driven organization committed to the well-being and lifelong success of college athletes."

98. The NCAA is essentially comprised of a series of agreements and conventions among its members.

99. As part of the agreements forming the NCAA, member institutions must provide certain considerations, such as ensuring that student-athletes maintain good standing, submitting documentation that demonstrates compliance with academic programs, and supplying financial data to the NCAA.

100.    In return, the NCAA provides its member institutions the chance to participate in collegiate sports.

101.    Thus, the NCAA primarily exists due to agreements among its members to manage and promote college athletics.

102.    Student-athletes are the purported beneficiaries of these agreements, a point made explicit by the NCAA:

    a. "With more than 1,100 member colleges and universities, the NCAA is united

around one goal, creating opportunities for college athletes."[2]

b.  "The National Collegiate Athletic Association is a voluntary, self- governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes…"[3]

c.  "The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body."[4]

103.    Therefore, even though student-athletes are not parties to the contracts between the NCAA and its member institutions, those agreements were established for the specific benefit of a designated class of which the plaintiff is a member.

104.    The NCAA and its member institutions had the authority to enter into the agreements that constitute the NCAA and provide its member institutions access to the college sports market, which the NCAA administers and controls.

105.    Those agreements are legal, valid, enforceable contracts.

106.    Student-athletes like the plaintiff were specifically considered as beneficiaries of those agreements.

107.    As part of those agreements, the NCAA agreed—either implicitly or explicitly— that it would make decisions and enforce its rules in accordance with its stated regulations, bylaws, and guidelines, doing so in a non-arbitrary and non-capricious manner.

108.    To enforce that part of the agreements, all necessary conditions, dependent obligations, and dependent covenants have been fulfilled.

109.    The NCAA violated its agreements by arbitrarily and capriciously denying the plaintiff the chance to participate in collegiate sports for at least another year, in violation

of the NCAA's own rules, regulations, bylaws, and guidelines.

110.     The plaintiff has standing to sue the defendant for this breach as a third-party beneficiary of the agreements.

111.     The plaintiff is entitled to the defendant's performance under the agreements.

112.     The plaintiff has suffered harm and will continue to experience harm due to the defendant's breaches.

113.     All conditions that must be met before filing this breach of contract claim have been fulfilled.

## COUNT VI:
## PROMISSORY
## ESTOPPEL

114.     The Plaintiff incorporates by reference all allegations stated in this Complaint.

115.     By promulgating rules, regulations, bylaws, and guidelines, the NCAA made certain commitments to college student-athletes.

116.     The NCAA consistently highlighted its commitment to student-athletes. welfare, making certain promises to college students.

117.     By granting waivers from its rules and regulations, the NCAA made specific promises to college student-athletes.

118.     These promises include, but are not limited to, a commitment that the NCAA will apply its rules, regulations, bylaws, and guidelines consistently and fairly, in a non-arbitrary and non-capricious manner.

119.     Those promises include, but are not limited to, the promise that the NCAA would not make arbitrary and capricious decisions regarding the welfare of college student-athletes.

120.     Those promises include, but are not limited to, the promise that the NCAA would genuinely consider and take into special account situations where adherence to NCAA

rules and regulations would harm the welfare of college student athletes.

121.    Those promises include, but are not limited to, the promise that the NCAA would

follow its own guidelines when deciding whether to grant college student-athletes waivers

from NCAA rules, regulations, and bylaws.

122.    Those promises include, but are not limited to, commitments that the NCAA

would genuinely consider requests for waivers from NCAA rules and regulations

submitted by college student-athletes.

123.    College student-athletes, including the plaintiff, relied on these promises.

124.    The NCAA foresaw, or should have foreseen, that college student-athletes like the

plaintiff would rely on those promises.

125.    The plaintiff reasonably relied on those promises when deciding whether to attend

college.

126.    The plaintiff justifiably relied on those promises to his detriment.

127.    The plaintiff has suffered harm and will continue to suffer harm because he

reasonably relied on the NCAA's promises.


**COUNT VII:**
**ARBITRARY ENFORCEMENT OF RULES, REGULATIONS, AND/OR BYLAWS**

128.    The Plaintiff incorporates by reference all allegations stated in this Complaint.

129.    The NCAA is essentially formed by a collection of agreements and conventions

among its members.

130.    In the context of those agreements, the NCAA agreed—either implicitly or

explicitly—that it would make its decisions and enforce its rules in accordance with its

stated regulations and to do so in a fair and consistent manner.

131.    The plaintiff is a third-party beneficiary of those agreements.

132.     The plaintiff is directly affected by the NCAA's decisions and the enforcement of its rules and regulations.

133.     The defendant has a duty and obligation to the plaintiff to make decisions and enforce NCAA rules in accordance with the stated regulations and to do so in a manner that is non-arbitrary, non-capricious, and non-selective.

134.     NCAA Bylaws include provisions for waiving or exempting individuals or institutions from the application of specific regulations.

135.     NCAA Bylaw 14.02.14 states that a waiver is an action exempting an individual or institution from following a specific regulation. As specified in the legislation, such a waiver requires formal approval, usually from an NCAA committee or a conference. This approval is contingent upon demonstrating compliance with the stated conditions or criteria under which the waiver is granted, or it may be based on extenuating circumstances.

136.     The plaintiff met the necessary qualifications and applied for a waiver, providing the required documentation and asserting facts and circumstances in accordance with the NCAA guidelines.

137.     However, the defendant has issued a formal decision rejecting the plaintiff's petition for a waiver and his request for an extra year of eligibility.

138.     The defendant has arbitrarily, capriciously, and selectively enforced Rule 14.4.3.7 and 14.4.3.7.1.3.

139.     Based on information and belief, Defendant has granted numerous waivers to Division 1 collegiate athletics student-athletes under similar circumstances.

140.     The defendant has enforced Bylaws 14.4.3.7.1.3 ("Extenuating Circumstances") and 14.4.3.7 ("Season-of-Competition Waiver – Competition While Eligible") in an

arbitrary, capricious, and selective manner. He ignores the anomaly of the COVID-19 restrictions, the plaintiff's mental health, and his mother's illness.

141.    Plaintiff has been irreparably damaged by this arbitrary, capricious and selective enforcement.

142.    Plaintiff is currently, and will continue to be, injured by the defendant's actions.

143.    Pursuant to Fed. R. Civ. P. 57, this Court has the power to "… declare rights, status, and other legal relations whether or not further relief is or could be claimed."

144.    The plaintiff is entitled to a declaratory judgment declaring void and unenforceable all NCAA rules, regulations, bylaws, or decisions that prevent his immediate eligibility to play at least one additional year of baseball at Maryland.

145.    The plaintiff is entitled to a permanent injunction enjoining the defendant from continuing the violations described in this Count.

## COUNT VIII:
## DECLARATORY
## JUDGMENT

146.    The Plaintiff incorporates by reference all allegations stated in this Complaint.

147.    According to Fed. R. Civ. P. 57, this Court has the authority to "…declare rights, status, and other legal relations, whether or not further relief can be claimed."

148.    The defendant has enforced Bylaws 14.4.3.7.1.3 ("Extenuating Circumstances") and 14.4.3.7 ("Season-of-Competition Waiver – Competition While Eligible") in an arbitrary, capricious, and selective manner. He ignores the anomaly of the COVID-19 restrictions, the plaintiff's mental health, and his mother's illness.

149.    For the reasons stated above, the plaintiff requests that this Court judge, hold, and declare that he possesses an economic right to market and license his name, image, and likeness.

150.        For the reasons stated above, the plaintiff asks this Court to judge, hold, and

declare that, under the Sherman Act analysis, he has two more years of eligibility to play

varsity baseball at Maryland and one more year of eligibility under the waiver analysis.

151.        For the reasons stated above, the plaintiff requests that this Court judge, hold, and

declare that he has a right to fair treatment by the NCAA.

152.        For the reasons stated above, the plaintiff requests that this Court judge, hold, and

declare his right to rational, fair, and equitable decisions from the NCAA in the

application of its rules, regulations, bylaws, and guidelines to him.

## COUNT IX:
## RESTRAINING ORDER AND INJUNCTIVE RELIEF

153.        Plaintiff incorporates by reference every allegation contained in this Complaint.

154.        The harm the plaintiff faces due to the NCAA's actions outlined above is

irreparable.

155.        The time that college athletes can compete is limited, and no amount of monetary

damages can alleviate or reverse the harm caused by wrongfully excluding them from

college athletic contests.

156.        Moreover, by substantially shrinking his Division I playing time, defendant is also

irreparably harming plaintiff's chances at playing professionally.

157.        For these reasons, the plaintiff also seeks an injunction from this Court enjoining

the NCAA from enforcing its rules, regulations, and/or bylaws, which prevent the plaintiff

from having two more years of eligibility to play baseball for Maryland.

**WHEREFORE,** Plaintiff demands the following:
a.        An order from this Court enjoining the NCAA from enforcing its rules,
regulations, and/or bylaws that prevent Plaintiff from having two more years of eligibility
playing baseball for Maryland under the Sherman Act analysis, or one more year under the
waiver request;
b.        All damages due to plaintiff as a result of defendant's conduct;
c.        Treble damages pursuant to 15 U.S.C. § 15;

d.      Plaintiff's attorneys' fees, costs and expenses; and

e.      For such other relief that the Court may deem just and equitable.

Dated this 3rd day of February, 2025.

[VERIFICATION ON FOLLOWING PAGE]

## VERIFICATION

I, Trey Cuilla-Hall ., have reviewed the within Verified Complaint and **make oath that the** facts contained in the Complaint are true of my own personal knowledge **except where stated** upon information and belief and as to such facts that I believe them to be **true.**

Signed and sworn to this **3rd** day of **February**_____, 2025.

_T. Cut_____

Trey Cuila-Hall

Respectfully submitted
Attorney for Plaintiff, Trey **Cuila-Hall**

By:  _Chfe Mch_____

Christopher M. Markey
Law Office of Christopher Markey
555 Pleasant Street, Suite 5A
New Bedford, Massachusetts 02740
(508) 717-0284
(774) 328-8238
cmarkeylaw@gmail.com
BBO 600215